# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEVEN SCOTT ZINTMAN,

Defendant-Appellant.

UNPUBLISHED
July 24, 2018

No. 334574
Marquette Circuit Court
LC No. 2014-053112-FC

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his conviction of first-degree felony murder, MCL 750.316(1)(b), and first-degree arson, MCL 750.72. Defendant was sentenced to life without possibility of parole for the first-degree felony murder conviction and 30 to 70 years' imprisonment for the arson conviction. We affirm.

## I. FACTS

This case arises from the death of defendant's girlfriend, Sally Plume, during a fire at defendant's residence in the early morning hours of May 4, 2014. The residence is a two-unit duplex owned by defendant and defendant's son and daughter-in-law, Daniel and Heather Zintman. At the time of the fire, defendant and Plume lived in one unit of the duplex, while Daniel and Heather lived in the other unit with their two minor children. The fire occurred in defendant's unit in the master bedroom shared by defendant and Plume.

Very early that morning, Heather woke Daniel when she noticed smoke in their unit of the duplex. Daniel investigated the source of the smoke and determined that it was coming from defendant's unit. Daniel told Heather to call 911, then went outside and banged on the door of defendant's unit. When he heard defendant's voice, he opened the door and realized that defendant's unit was filled with smoke. Defendant was standing in the kitchen and holding onto the kitchen counter; defendant's face appeared purple in color and he was taking deep breaths. Daniel testified that defendant is an alcoholic and is almost always intoxicated. He urged defendant to leave the unit, but because he smelled alcohol on defendant he determined that defendant would probably be uncooperative. Daniel therefore knocked defendant down and dragged him from the unit. Daniel testified that defendant did, in fact, resist his efforts to drag him from the unit. During this struggle, Daniel asked defendant if he was trying to kill himself, and defendant replied that it was "a good day to die."

-1-

Daniel succeeded in dragging defendant from the unit, then asked him whether Plume was in the unit. At first, defendant did not respond, but eventually he told Daniel that Plume was not home and had gone somewhere with a friend. Daniel then went back to his unit and verified that Heather, their two children, and their pets were out of the duplex.

The first emergency personnel to arrive was Steven Tighe, a paramedic with Forsyth Township EMS. Tighe testified that when he arrived at the home, he spoke with defendant to ascertain if he was hurt and observed that defendant appeared to be intoxicated. When he asked defendant if anyone else was in the house, defendant did not respond. After further questioning by Tighe and Daniel, defendant said that Plume was in the back bedroom, passed out on the bed. Tighe testified that from the time he first asked defendant if anyone was in the unit until the time defendant stated that Plume was in the house was "a few minutes." Daniel and Tighe got a ladder and looked in the bedroom window where they observed both smoke and fire in the room. By this time, additional rescue personnel had arrived and they located Plume's body in the bedroom. Plume was dead, and was partially on the bed and partially on the floor, in a kneeling position.

The medical examiner, George Krzymowski, testified that the cause of Plume's death was asphyxia by smoke inhalation, and that Plume had been alive when the fire started. He further testified that Plume's blood alcohol level was 0.272; Krzymowski testified that 0.3 could be considered a medical emergency and described Plume as having been "very intoxicated." He further testified that there was citalopram in Plume's system, which Krzymowski testified is an antidepressant.

Sergeant William Smith, fire investigator with the Michigan State Police, testified that the origin of the fire was the mattress, and that there was no evidence of an accelerant. Smith testified that the fire did not originate with either the electrical or gas service, as both were shut off. Smith concluded that the fire was of human origin, but it was not possible to determine whether it had been started accidentally or intentionally. Smith testified that the fire could have been started by a lighter or a cigarette, but there was no evidence that either item was used to start the fire. Smith also testified that at the scene of the fire, on the floor of the bedroom on the side of the bed where defendant indicated he had been sleeping, investigators found an item that later testimony revealed to be a wooden dowel rod that defendant had labeled with the words "b**ch beater." An ashtray was also found near the bed.

Sergeant Adam Lafave with the Forsyth Township Police Department testified that at the scene of the fire, he spoke with defendant twice. The first time, Lafave asked defendant what had happened and defendant responded that he had blanked out and did not remember. Defendant then told Lafave that he had been in the bedroom with Plume when the fire started. Lafave testified that defendant appeared to be intoxicated, had difficulty standing, and was mumbling.

Later that morning, while still at the scene of the fire, Lafave questioned defendant again. This time, defendant told Lafave that he had been in the kitchen when the fire started. In response to questioning, defendant told Lafave that he and Plume had spent the day "monkeying around" the house, "putting up foam," and drinking alcohol. Defendant stated that Plume had become so intoxicated that he had had to drag her to bed. Defendant also stated that someone

-2-

named "Jim" had been at the unit that day, but defendant could give no further information about that person. Lafave questioned defendant about why initially he had refused to leave the house when Daniel tried to help him. At first, defendant stated that he didn't know why, but later defendant stated that it was because his house was his sanctuary and also that he does stupid things when he is drunk.

Lafave testified that while talking with defendant at the time of the fire, defendant's clothes had a black, charred substance on them that defendant claimed had been dripping from the ceiling fan, which Lafave understood to mean the bedroom ceiling fan. Lafave asked defendant how that came to be on his clothing if he had not left the kitchen, and defendant responded that he didn't know. Lafave testified that when searching the kitchen after the fire, the officers discovered a smoke detector on the kitchen counter with a hat over it; the battery of the smoke detector had been partially removed so that the leads did not connect with the smoke detector, making the smoke detector inoperative.

Officer Kristi Uren with the Forsyth Township Police Department testified that defendant was taken to the hospital, where she informed him that Plume had died. Defendant became very upset and began to cry. Uren testified that defendant then asked her if it was possible that an accelerant had been placed on the window, and also asked her whether Plume's ex-boyfriend had started the fire.

Three weeks after the fire, Lafave interviewed defendant a third time, this time at the police station. During this interview, defendant told Lafave that on the day leading up to the fire, someone named Paul had been at the unit with a "half gallon" of alcohol and that the three of them had been drinking. When Lafave questioned him about Paul, defendant changed the name of the person to Bob, but could not provide any other information about Bob. Defendant stated that Plume had become so intoxicated that he put her in bed, and then joined her in bed after Bob left. Later, he awoke to flames. Defendant told Lafave that he could not lift Plume, so he went outside and got himself wet, then went back into the unit, but Daniel dragged him from the house before he could go upstairs to attempt to rescue Plume. Defendant explained to Lafave that he said it was a good day to die because he thought he would die if he went back upstairs to the bedroom. Lafave testified that during this interview defendant suggested that Plume started the fire by flicking a cigarette onto the comforter. Defendant denied Lafave's suggestion that defendant and Plume had a suicide pact or that he had a plan to kill Plume.

About one month later, Lafave and Detective Christopher MacMaster of the Michigan State Police interviewed defendant a fourth time. MacMaster testified that at the beginning of the interview, which lasted five to seven hours, defendant asserted that he did not remember what had happened the night of the fire. Defendant told MacMaster that on the day of the fire, he and Plume and a man named Scott had been drinking at the unit during the day; defendant could provide no further details about Scott. Defendant stated that eventually Plume was very intoxicated and he carried her upstairs and put her in bed, then fell asleep. He stated that he awoke to flames in the bedroom, then tried to wake Plume. After failing to wake Plume, he took the cat and went outside to find water to douse himself. While outside he met his son, then reentered the house and tried to go upstairs but could not because of the smoke and fire.

Later in the interview, defendant stated that on the morning of the fire he had been in bed with the sleeping Plume and was looking for cigarettes under the mattress, using the lighter as a light, when he accidentally ignited the fabric hanging down from the mattress. Upon further questioning by MacMaster, defendant stated that he started the fire while playing with a cigarette that accidentally lit some white lace on the bed on fire. Defendant stated that he thought he had put the fire out, then went to sleep, but later awoke to flames. When asked repeatedly during the interview whether he set the fire, defendant eventually replied that "I gave myself a birthday present and set my girlfriend on fire." MacMaster testified that defendant was smiling when he made the statement. Defendant confirmed to MacMaster that the night of the fire was his birthday. After telling this information to MacMaster, defendant stated "I'm going to prison, I'm going to f***ing prison." When MacMaster asked defendant some written questions, including whether defendant thought he had been fairly treated during the interview, defendant's written response was "Yes. Where['s] the rope."

Katie Thibeau, a neighbor of defendant, testified that she spoke with defendant when he was discharged from the hospital a few weeks after the fire. She testified that she went to his duplex to offer her condolences regarding Plume, and that he had wanted to show her the bedroom where the fire occurred. She testified that defendant pointed to a pile of clothes as the spot where the fire had started, claiming that Plume had dropped a cigarette there and started the fire. He told her that he had thrown the cat out the window to save it and had tried to drag Plume out the window, but was unable to. His demeanor when telling this story was very matter of fact, according to Thibeau. He also referred to Plume as "Sarah" instead of Sally. In the following weeks, defendant told Thibeau various versions of what had occurred. One version was that the cat had tipped over a candle in the room, starting the fire. On another occasion he told her that a heater started the fire; when she reminded him that it was her heater that he had borrowed and that he had returned it before the fire, defendant changed the story stating that a lantern tipped over and started the fire.

In August, 2014, more than three months after the fire, Thibeau was listening to defendant talk about the fire and she asked him why he could not just tell the truth that he had lit his girlfriend on fire and watched her burn, to which defendant replied "Well, I didn't watch her burn." Thibeau testified that defendant made this statement in a matter of fact manner without emotion, and that he was highly intoxicated at the time. Thibeau further testified that within one to two weeks of defendant returning to his home after the fire, she saw defendant with a new girlfriend.

Defendant's ex-wife, Leila-Marhi Black, testified that she had met defendant on a dating website, dated him for two years, and then was married to him for two years before leaving him in November 2013. She testified that defendant is an alcoholic and that while married to him defendant typically drank straight vodka from the time he awoke until he passed out. She testified that he would throw pop bottles and pop cans at her and dump pop on her head. He also had a stick made from a dowel from the closet; he had drilled a hole in the dowel and had put a rope through it and had written "b**ch stick" or "b**ch beater" on it. She testified that he told her that he kept it by his bedside when he slept because he thought she would attack him while he was unconscious. Black identified the stick as the object in the photograph of the bedroom taken after the fire. She testified that he never hit her with the stick, but that he had brandished it at her, and also that he had pushed and shoved her. Black further testified that defendant once

told her that "one of these days you're not going to wake up" or "one of these days they're not going to find you," which she understood to mean that he would kill her in her sleep.

Black testified that while she was married to defendant she got a small dog named Lucy, and that Lucy and defendant did not like each other. Black testified that one day when she was drunk and had passed out, she thought she heard Lucy whining. Defendant came into the bedroom and she asked him if he had let Lucy out, to which defendant replied "Lucy is no longer with us." When Black questioned him, he said that the dog had urinated on the floor, so he had rubbed her nose in it and that the dog's neck had snapped and she had started bleeding, and so he buried her out back. Black testified that she did not believe defendant and went back to sleep. Later when she awoke and looked for the dog, he told her that he had physically kicked Lucy out the door and she had flown over the truck, and had never come back. Black then observed that there was blood and urine on the living room floor. Lucy never returned, and Black moved out the next day and later divorced defendant.

Black also testified that defendant believed that his son, Daniel, wanted the entire duplex and that defendant told her that he would burn the duplex down before he would let his son take his half. She further testified that defendant burned pages that he had torn from her journal and had also burned pictures of her children. She also testified that May 3 is defendant's birthday and that defendant typically would become upset if his family did not acknowledge his birthday.

Black testified that after defendant was arrested, she visited him in jail because she wanted to ascertain if he had intentionally set the fire. She testified that defendant told her that he thought the fire started from a candle, but otherwise was reluctant to talk about the fire. She further testified that defendant suggested that they get back together once he was released.

Dr. Bruce Harvey, an emergency room physician, was called by the defense and testified that both chronic alcoholism and carbon monoxide poisoning can cause memory blackouts and confabulation. Dr. Harvey also testified that defendant's blood test indicated that defendant was very intoxicated on the night of the fire and also had high levels of carbon monoxide. On rebuttal, Black testified that during the four years that she was in a relationship with defendant, she never observed him having memory problems or blackouts. Daniel, too, testified on rebuttal that before the fire he had never observed defendant having memory loss, but that he had observed defendant rearrange details of a story to improve his own role.

At the conclusion of trial, the jury found defendant guilty of first-degree arson and first-degree felony murder. The trial court sentenced defendant to life without possibility of parole for the murder conviction, and to life imprisonment for the arson conviction. Upon defendant's motion, the trial court resentenced defendant on the arson conviction to 30 to 70 years' imprisonment.

Defendant also moved for a new trial, alleging ineffective assistance of counsel at trial, and requesting the alternate relief of a *Ginther*[1] hearing. The trial court granted the *Ginther*

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

hearing, at the conclusion of which the trial court determined that defendant had not been denied effective assistance of counsel at trial, and therefore denied defendant's motion for new trial.

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence was not sufficient to prove the essential elements of his arson conviction, which was the underlying felony for his first-degree felony murder conviction. We disagree.

Every defendant has a due process right to have the charge against him or her proven by sufficient evidence. *People v Oros*, 320 Mich App 146, 152; 904 NW2d 209 (2017). Thus, to justify a guilty verdict, the prosecution is required to introduce sufficient evidence on each element of an offense. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). This Court reviews a challenge to the sufficiency of the evidence de novo to determine whether, viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to justify the conclusion of a rational trier of fact that the evidence proved the essential elements of the crime beyond a reasonable doubt. *People v Solloway*, 316 Mich App 174, 180-181; 891 NW2d 255 (2016).

Circumstantial evidence and all reasonable inferences drawn from circumstantial evidence can constitute satisfactory proof of the crime. *Id*. This Court defers to the determination of the trier of fact regarding what inferences may be drawn from the evidence presented, as well as the weight accorded to those inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Similarly, this Court will not disturb the trier of fact's credibility determinations. *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). Although the prosecution is required to prove the elements of the crime beyond a reasonable doubt, the prosecution is not required to disprove every reasonable theory consistent with the defendant's innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Defendant was convicted of first-degree felony murder, MCL 750.316(1)(b). To secure a conviction of that offense the prosecution must introduce evidence sufficient to prove that the defendant (1) killed a human being, (2) with the intent to kill, do great bodily harm, or create a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result (malice), and (3) the death occurred while the defendant was committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in the statute, including arson. *People v Bobby Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007).

As the predicate felony underlying the felony murder conviction, defendant was convicted of first-degree arson, MCL 750.72, which provides, in relevant part:

(1) A person who willfully or maliciously burns, damages, or destroys by fire or explosive any of the following or its contents is guilty of first degree arson:

(a) A multiunit building or structure in which 1 or more units of the building are a dwelling, regardless of whether any of the units are occupied, unoccupied, or vacant at the time of the fire or explosion.

(b) Any building or structure or other real property if the fire or explosion results in physical injury to any individual. [MCL 750.72(1).]

Thus, to prove first-degree arson, the prosecution was obligated to show that defendant (1) willfully or maliciously, (2) burned, damaged, or destroyed by fire or explosive, either (3) a multiunit building or structure containing at least one dwelling unit, or (4) any building or structure resulting in physical injury to any individual. Here, there is no dispute that defendant's residence was burned and damaged by fire and that the residence was part of a multiunit building containing a dwelling. There is also no dispute that the fire resulted in Plume's death. And although defendant gave several inconsistent statements, he ultimately admitted to police that he set the fire, albeit accidentally. Thus, the only disputed element is whether defendant burned the residence "willfully or maliciously."

To prove that a defendant acted "willfully or maliciously" in the context of arson, the prosecution must demonstrate:

1) that the defendant intended to do the physical act constituting the actus reus of arson, i.e., starting a fire or doing an act that results in the starting of a fire (intentional arson); or 2) that the defendant intentionally committed an act that created a very high risk of burning a dwelling house, and that, while committing the act, the defendant knew of the risk and disregarded it (wanton arson). [*Nowack*, 462 Mich at 409.]

An actor's intent may be inferred from surrounding facts and circumstances. *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998). Moreover, given the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient. *Id*. In addition, inconsistent statements can be considered as indicating consciousness of guilt. *People v Unger*, 278 Mich App 210, 225-226; 749 NW2d 272 (2008).

In this case, the prosecution introduced sufficient evidence from which a jury could conclude that defendant, who admittedly set the fire, did so willfully or maliciously.

**1. Failure to reveal Plume's presence in the house.** At the scene of the fire, defendant at first failed to reveal that Plume was in the residence. When both Daniel and Tighe initially asked about Plume's location, defendant was silent. A few minutes later, defendant told Daniel that Plume was out with a friend. Upon repeated questioning, defendant revealed that Plume was in the residence. While this could be explained by confusion brought on by intoxication and carbon monoxide poisoning, it could also be considered an intentional act to delay Plume's rescue, which could be considered proof of his having intentionally set the fire for the purpose of killing her.

**2. Resisting Daniel's rescue efforts.** Daniel testified that when he tried to drag defendant from the house, defendant resisted his efforts. When Daniel asked him if he was trying to kill himself, he replied that it was "a good day to die." From this statement, the jury could conclude that defendant intentionally set the fire because he was suicidal.

**3. Inconsistent stories.** Defendant told numerous inconsistent stories about his location and actions on the morning of the fire. At the scene of the fire, defendant first told Officer

Lafave that he blanked out and did not know what had happened, then told Lafave that he was in the bedroom when the fire started. A short time later, he told Lafave that he was in the kitchen when the fire started. When Lafave interviewed defendant three weeks later, defendant stated that he had been sleeping in the bedroom with Plume and awoke to flames, tried to drag Plume out but couldn't, went outside to get wet, then tried to return to rescue Plume but was dragged from the house by Daniel. During this interview defendant suggested that Plume started the fire by flicking a cigarette onto the comforter. When defendant was interviewed a fourth time one month later, defendant stated that he had been in bed with the sleeping Plume and was looking for cigarettes under the mattress, using the lighter as a light, when he accidentally ignited the fabric hanging down from the mattress. In that same interview, he also stated that he accidentally started the fire when his cigarette ignited some lace on the comforter, and that he thought that he put the fire out, but later awoke to flames.

Thibeau, defendant's neighbor, testified that he also told her conflicting accounts after the fire. First, he told her that Plume had started the fire by dropping a cigarette on a pile of clothing, and that he had tried to drag Plume out the window. Later, he told Thibeau that the cat had tipped over a candle in the room, starting the fire. On another occasion he told her that a heater started the fire; when she reminded him that he had returned the heater to her before the fire, defendant changed the story stating that a lantern tipped over and started the fire. The jury could have inferred from the inconsistent statements that defendant was trying to conceal his guilt.

Defendant also reported that during the day before the fire, another man had joined defendant and Plume in drinking. Defendant told Lafave that this man was named Jim. Later, defendant told Lafave during the third interview that the man was named Paul. When Lafave questioned him further, defendant said the man was named Bob. During the fourth interview, defendant told MacMaster that the man was named Scott. Defendant could not provide any further information about this man. The jury could have inferred that these inconsistent statements indicated that the other man was a fiction created by defendant to deflect suspicion from himself.

**4. The disabled smoke detector.** Daniel testified that when he entered defendant's unit on the morning of the fire, the unit was full of smoke and defendant was standing in the kitchen holding onto the kitchen counter. When later searching the house, officers found on the kitchen counter a disabled smoke detector. The smoke detector was covered with a hat. The jury could have inferred from this that defendant had disabled the smoke detector, perhaps because the smoke detector alarm had gone off (or defendant feared that it would), and then concealed it with the hat. Daniel's discovery of defendant in the kitchen next to the counter supports this inference.

**5. Defendant's admissions.** Defendant also made statements that could be considered admissions. Detective MacMaster testified that during the fourth interview, defendant stated, while smiling: "I gave myself a birthday present and set my girlfriend on fire." Thibeau, defendant's neighbor, testified that three months after the fire she confronted him and asked him why he could not just tell the truth that he had lit his girlfriend on fire and watched her burn, to which defendant replied, "Well, I didn't watch her burn." The jury could infer from these statements that defendant had intentionally set the fire that killed Plume.

Because a defendant's intent may be inferred from surrounding facts and circumstances, and because minimal circumstantial evidence is sufficient given the difficulty of proving an actor's state of mind, *Fetterley*, 229 Mich App at 517-518, the prosecution introduced sufficient evidence from which the jury could have concluded that defendant, who admittedly set the fire, did so willfully or maliciously. The prosecution therefore introduced evidence sufficient to support the arson conviction, and therefore proved the predicate felony for the felony murder conviction.

## B. PRIOR ACTS OF DOMESTIC VIOLENCE

Plaintiff contends that the trial court improperly admitted evidence of defendant's other acts of domestic violence through the testimony of Black, defendant's ex-wife. We disagree.

This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *People v Wilder*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Docket No. 154814); slip op at 3. The trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Barnett v Hidalgo*, 478 Mich 151, 158; 732 NW2d 472 (2007). Preliminary questions relating to the admission of evidence, such as whether a rule of evidence precludes the admission of evidence, are reviewed de novo. *Wilder*, ___ Mich at ___; slip op at 3; *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

Generally, relevant evidence is admissible unless its probative value is outweighed by the danger of unfair prejudice. MRE 402; MRE 403; *Railer*, 288 Mich App at 219. In addition, MRE 404(b) generally precludes the prosecution from introducing evidence of the defendant's other crimes, wrongs, or acts for the purpose of showing the defendant's propensity to commit a crime. *Id*. But in the context of domestic violence, MCL 768.27b permits the prosecution to introduce evidence of prior domestic violence for the purpose of showing the defendant's character or the defendant's propensity to commit domestic violence. *People v Schultz*, 278 Mich App 776, 778; 754 NW2d 925 (2008). MCL 768.27b provides, in pertinent part:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.
>
> * * *
>
> (5) As used in this section:
>
> (a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:
>
> > (*i*) Causing or attempting to cause physical or mental harm to a family or household member.

(*ii*) Placing a family or household member in fear of physical or mental harm.

(*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

(*i*) A spouse or former spouse.

(*ii*) An individual with whom the person resides or has resided.

(*iii*) An individual with whom the person has or has had a child in common.

(*iv*) An individual with whom the person has or has had a dating relationship. As used in this subparagraph, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. The term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context.

The statute is intended to allow "prior bad acts" evidence of domestic violence to be admitted as long as the evidence satisfies the "more probative than prejudicial" requirement of MRE 403. *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011). The language of the statute permits a trial court to admit relevant evidence of other domestic assaults to prove any issue, including the defendant's character. *Id*. at 609. If the danger of unfair prejudice outweighs the probative value of the evidence, however, the trial court is obligated to exclude it. *People v Watkins*, 491 Mich 450, 484-486; 818 NW2d 296 (2012).

Defendant first argues that Black's testimony was improperly admitted because he was not charged with an offense involving domestic violence[2] as required for the admission of evidence of prior domestic violence under MCL 768.27b. The statute defines an offense involving domestic violence to mean an occurrence that causes or attempts to cause physical or mental harm to a family or household member. MCL 768.27b(5)(a)(*i*). A family or household member is defined by the statute to include individuals with whom the defendant resides or with whom the defendant has a dating relationship. MCL 768.27b(5)(b)(*ii*), (*iv*); *Railer*, 288 Mich App at 220 n 3. Here, defendant was accused of first-degree arson causing the death of Plume.

---

[2] At the hearing on the motion in limine, defense counsel essentially admitted that the arson was an offense involving domestic violence.

Because the offense caused physical harm to Plume, defendant's girlfriend who resided with him, the arson was an "offense involving domestic violence" within the meaning of the statute.

Defendant also argues that the trial court erred by admitting the evidence of the prior domestic violence because the prior acts differ from the charged offense in this case. This Court, however, has held that prior acts of domestic violence are admissible under MCL 768.27b regardless of whether the acts are "identical to the charged offenses." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). Furthermore, the statute does not require that prior acts of domestic violence be similar in kind to the charged conduct to be admissible.

Defendant also argues that the evidence was not relevant, and that any relevance was outweighed by its prejudicial effect. Even when evidence is admissible under MCL 768.27b and is relevant under MRE 402, it may still warrant exclusion if it is unfairly prejudicial. *Watkins*, 491 Mich at 481. Only when unfair prejudice outweighs the probative value of evidence, meaning that "there is a danger that the evidence will be given undue or preemptive weight by the jury" or that it would be inequitable to admit the evidence, need the evidence be excluded. *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

Here, the prior acts of domestic abuse were relevant to show defendant's character and his propensity to commit acts of violence against his domestic partner. Black testified that defendant shoved and pushed her, and sometimes threatened that "one of these days you're not going to wake up" or "one of these days they're not going to find you," which she understood to mean that he would kill her in her sleep. He also told her that he had killed her dog while she slept; Black testified that because there was blood on the floor and the dog did not return, she believed that he had, in fact, killed the dog. She further testified that defendant burned pages that he had torn from her journal and had also burned pictures of her children, using fire to inflict the domestic violence (engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested). He also told her that he would burn down the duplex (where at that time she lived with defendant) to prevent his son from obtaining sole ownership of it. This evidence was relevant to show defendant's propensity to commit an act of domestic violence, see *Railer*, 288 Mich App at 219-220, and it permitted the jury to assess the charges in light of the bigger picture of defendant's behavioral history. See *Schultz*, 278 Mich App at 779. Given that the disputed element at trial was whether defendant possessed the requisite intent for the arson conviction, Black's testimony regarding defendant's propensity to commit domestic violence was relevant.

The evidence also was not unfairly prejudicial. Given that MCL 768.27b allows evidence to be admitted for propensity purposes in cases of domestic violence, when balancing MRE 403 concerns, "courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Watkins*, 491 Mich at 487 (discussing the similar statute MCL 768.27a). Here, weighing the propensity value of the evidence in favor of admission, its value outweighed MRE 403 concerns. See *People v Daniels*, 311 Mich App 257, 272; 874 NW2d 732 (2015) (evidence of previous domestic violence is admissible because the defendant's history governs the likelihood that defendant committed a given crime). Considerations that may lead to exclusion of such evidence include dissimilarity between the other acts and the charged offense, temporal proximity, infrequency of the other acts, intervening acts, the lack of reliability of the other acts, and the lack of need for the other acts evidence.

*Watkins*, 491 Mich at 487-488 (discussing the similar statute MCL 768.27a). Black's testimony in this case was similar in that it involved use of fire to threaten and intimidate a domestic partner, some of the violence occurred or was threatened to occur when the domestic partner was asleep, the other acts of domestic violence occurred within approximately 18 months of each other, and there was no indication that the other acts evidence was unreliable. Further, Black's testimony was not particularly graphic or inflammatory and therefore was not likely to interfere with the jury's ability to logically weigh the evidence. See *Railer*, 288 Mich App at 220-221. It therefore cannot be said that the trial court abused its discretion in admitting Black's testimony.

Defendant also argues that the testimony of Shelly Ovink should have been excluded. Ovink was called by the prosecution as an expert witness in psychology to testify on the subject of domestic violence. Ovink, however, did not offer testimony of previous domestic violence by defendant, and in fact admitted that she did not know defendant. Because there is no indication that her testimony was admitted under MCL 768.27b, nor did defendant object to her testimony at trial, this contention is without merit.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Before the trial court, defendant moved for a new trial, or in the alternative a *Ginther* hearing, contending that defense counsel at trial was ineffective for failing to request an instruction to the jury that the police had failed to record defendant's fourth interview. The trial court held a *Ginther* hearing as defendant requested, but thereafter denied defendant's motion for new trial. Defendant contends that the trial court abused its discretion by denying his motion. We disagree.

This Court reviews a trial court's decision on a motion for new trial for an abuse of discretion. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). Whether counsel was ineffective is a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews the trial court's findings of fact, if any, for clear error, while the ultimate constitutional issue arising from the claim of ineffective assistance of counsel is reviewed de novo. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Whether defendant was entitled to a jury instruction also is a question of law that this Court reviews de novo. See *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

The effective assistance of counsel is presumed, and criminal defendants have a heavy burden of proving otherwise. *People v Schrauben*, 314 Mich App 181, 190; 886 NW2d 173 (2016). To demonstrate ineffective assistance of counsel, the defendant must prove that "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different." *Solloway*, 316 Mich App at 188 (citation omitted). Here, defendant's claim of ineffective assistance arises from defense counsel's failure to request a jury instruction advising the jury that the police failed to record defendant's fourth interview as required by statute. Defendant contends that he was in custody at the time of the fourth interview, and that therefore the police were required to audiovisually record the interview.

MCL 763.8 requires audiovisual recording of custodial interrogations. When law enforcement fails to record a custodial interrogation, MCL 763.9 provides, in relevant part:

> . . . [t]he jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement.

MCL 763.7(a) defines "custodial detention" as "an individual's being in a place of detention because a law enforcement official has told the individual that he or she is under arrest or because the individual, under the totality of the circumstances, reasonably could believe that he or she is under a law enforcement official's control and is not free to leave." In this case, the testimony at the *Ginther* hearing indicates that defendant was not in "custodial detention" at the time of the fourth interview. After talking to Sergeant Lafave twice on the morning of the fire, and then again in an interview at the police station, defendant agreed to undergo a polygraph test. On the day of the polygraph test,[3] defendant signed a *Miranda*[4] waiver form and a polygraph waiver form stating that he had the right to refuse the test. Defendant testified that the rights on the waiver forms were explained to him by Detective MacMaster. Defendant testified that when he was read his *Miranda* rights, he believed that he could not leave, but also testified that no one told him that he had to stay at the interview and he was not told that he was under arrest. Defendant was not handcuffed. He testified that "what I was doing was volunteering my time into trying to get this procedure taken care of" and that he wanted to take the polygraph test "to clear himself." After the interview, the police drove defendant home and defendant was not arrested until approximately two months later.

Defendant suggests that another factor influencing whether he believed he was free to leave was his physical condition as an alcoholic. At the *Ginther* hearing, Dr. John Lehtinen testified regarding the symptoms of withdrawal from alcohol, which he testified include extreme agitation, paranoia, seizures, and hallucinations. He also testified that a person experiencing alcohol withdrawal might experience increased heart rate, elevated blood pressure, and sweating that would be very observable to others. Withdrawal symptoms might also include less observable reactions such as tremors, mild agitations, and headaches.

A review of the record indicates that the trial court correctly concluded that defendant was not in custodial detention at the time he made the incriminating statements. The trial court considered the totality of the circumstances surrounding the fourth interview, including that defendant agreed to the polygraph, willingly accepted transportation to and from the interview by

---

[3] On the day originally set for the polygraph examination, the transporting officer arrived at defendant's home, but defendant acknowledged that he had been drinking. The exam was rescheduled and defendant cooperated by refraining from alcohol on that day. The fact that this interview took place essentially by appointment belies the contention that defendant was in custodial detention.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

police officers, and acknowledged that he had been advised of his rights before the interview, including the right to halt the examination at any time. Defendant was therefore not entitled to a jury instruction regarding the fact that the fourth interview was not recorded, and defense counsel cannot be said to have been ineffective for failing to request the instruction.

In defendant's Standard 4[5] brief, he also argues that his trial counsel was ineffective by failing to have his clothing from the night of the fire tested to prove that he was in the bedroom, not in the kitchen of his home. This argument is without merit because there is no dispute that defendant was in the bedroom on the night of the fire. During the investigation, defendant eventually conceded that he had started the fire in the bedroom, albeit accidentally. Because the prosecution does not dispute that defendant was in the bedroom, it was unnecessary for defense counsel to attempt to establish this point.

However, the prosecution did argue during closing argument that defendant was not in the bedroom at the time that the ceiling fan began to melt from the heat, arguing that defendant must have left the bedroom before the fire got that hot or defendant would no doubt have suffered burns. In any event, even if the substance on defendant's pants was burned plastic from the bedroom fan, that evidence would not refute that defendant had set the fire willfully or maliciously, but instead would prove only that he had been in the bedroom long enough for the fire to get very hot. This would be compatible with the prosecution's theory that defendant originally intended to commit suicide when he set the fire, but went to the kitchen when the fire became hot and attempted to deeply breath the smoke from that location, but was foiled by Daniel's rescue. Defense counsel was therefore not ineffective for failing to have the substance on defendant's pants tested.

Defendant also argues that defense counsel at trial was ineffective for failing to permit him to review the police report and pictures of the crime scene. Defendant points to nothing in the record that would support this allegation or to indicate that he raised this concern before the trial court. A defendant must establish the factual predicate for his claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Further, when an argument is not supported by citation to the record, this Court need not search for a factual basis to support the defendant's claim. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008).

### D. SEQUESTRATION OF WITNESSES

In defendant's Standard 4 brief, defendant also argues that the trial court erred and violated a witness sequestration order by permitting witnesses Daniel Zintman and Marhi Black to testify in rebuttal, as they had been present in the courtroom after their testimony in the prosecution's case in chief. We disagree.

We note that defendant did not raise this issue before the trial court. This issue is therefore unpreserved for review by this Court. See *People v Grant*, 445 Mich 535, 546; 520

---

[5] Administrative Order No. 2004-6.

NW2d 123 (1994). This Court reviews an unpreserved assertion of ineffective assistance of counsel for mistakes apparent on the record. *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). This Court reviews a trial court's decision regarding witness sequestration for an abuse of discretion. *People v Jehnsen*, 183 Mich App 305, 309; 454 NW2d 250 (1990).

A trial court has discretion to order sequestration of the witnesses so that the witnesses do not hear the testimony of other witnesses. MRE 615. The purpose of sequestration is to prevent a witness from conforming his or her testimony to that of another witness. *People v Meconi*, 277 Mich App 651, 654; 746 NW2d 881 (2008). A defendant who contends on appeal that a witness violated the trial court's sequestration order must demonstrate that he or she has been prejudiced by the violation. *People v Solak*, 146 Mich App 659, 669; 382 NW2d 495 (1986).

In this case, defendant has not demonstrated that Daniel and Black in fact violated a sequestration order; defendant points to no place in the record where this fact was raised or discussed. But assuming for the sake of argument that they were present in the courtroom before their rebuttal testimony, defendant has not demonstrated that the rebuttal testimony of Daniel and Black, after allegedly being present in the courtroom for part of the proceedings, prejudiced him. Daniel and Black were both called as rebuttal witnesses after initially testifying as part of the prosecution's case in chief, and were questioned by the prosecution regarding whether they had ever experienced defendant exhibiting memory loss or blackouts. Both testified that they had not observed defendant exhibiting either memory loss or blackouts. Defendant does not explain how their presence during the proceedings affected this rebuttal testimony or how it unfairly prejudiced him. Having failed to demonstrate prejudice by the rebuttal testimony, defendant's contention of error is without merit.

Affirmed.


/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola